GISKAN SOLOTAROFF & ANDERSON LLP
1 Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 847-8315
David O'Brien
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

PETA-GAYLE WHITE,                              :
                                               :          Civil Action No.: 1:26-cv-873
          Plaintiff,                     :
                                               :          **COMPLAINT**
          -against-                            :
                                               :          **DEMAND FOR JURY TRIAL**
THE CITY OF NEW YORK and                 :
JUANITA HOLMES,                                :
                                               :
          Defendants.                    :
------------------------------------------------------x

  Plaintiff, Peta-Gayle White ("Ms. White" or "Plaintiff"), by and through her attorneys,

Giskan Solotaroff & Anderson LLP, alleges the following against Defendants the City of New

York (the "City") and Juanita Holmes ("Commissioner Holmes," "Defendant Holmes," or

"Holmes" or, collectively with the City, "Defendants").

## NATURE OF THE ACTION

  1.  This is an action for retaliation and interference in violation of the Family and

Medical Leave Act of 1993 ("FMLA") (29 U.S.C. § 2601, *et seq.*); discrimination on the basis of

disability in violation of Section 504 of the Rehabilitation Act, 29 U.S.C.S. § 794, the New York

State Human Rights Law ("NYCHRL"), New York Executive Law § 290, *et seq.*, and the New

York City Human Rights Law ("NYCHRL"), New York City Administrative Code § 8-107; and

retaliation for seeking a reasonable accommodation in violation of the NYCHRL.

1

2.      Ms. White began working for the New York City Department of Probation ("DOP") in August 2024, as Deputy Commissioner for Strategic Initiatives, a position she held for the remainder of her tenure. Along with approximately eight other Deputy Commissioners, Ms. White reported directly to then-DOP Commissioner Juanita Holmes.

3.      Defendant Holmes has been widely criticized for her management style, which included berating staff, prioritizing avoiding public scrutiny over addressing problems, and policy changes that shifted the focus of the DOP from rehabilitation to aggressive law enforcement.

4.      Throughout Ms. White's time at the DOP, Commissioner Holmes would unjustifiably harshly criticize the Deputy Commissioners. Among other criticisms, Ms. Holmes told the Deputy Commissioners that they were "weak" for not berating or intimidating their subordinates.

5.      Beginning in January 2025, Holmes' behavior took a dramatic shift for the worse. She berated Ms. White more often, calling her at inappropriate hours and baselessly criticizing her work.

6.      In February or March 2025, Holmes reduced Ms. White's salary by 23%, or $45,000. Ms. White received no explanation or formal advance warning.

7.      Ms. White began developing stress and anxiety as a result of Holmes mistreating her. On Thursday, May 1, 2025, Ms. White felt sick and left work early. That day, she consulted a doctor, who advised that she take some time off from work, to address her medical conditions. Ms. White stayed home from work through the following week, using accrued sick time, and submitting a series of doctor's notes to the DOP.

8.      On May 6, 2025, the DOP's Assistant Commissioner of Human Resources and Labor Relations, Chikera Beckford, told Ms. White that Ms. White had to request leave pursuant to the FMLA. Ms. White visited her doctor on May 9, 2025, and submitted an application for FMLA leave to the DOP on May 12, 2025. That day, Ms. Beckford called and said that Ms. White had to re-submit the application, and then sent Ms. White an email attaching what she called the "correct" form. The form, though, was identical to the one Ms. White had already submitted. Ms. Beckford then called Ms. White and stated that Ms. White would have to return to work during the pendency of her application. Ms. White responded that a return to work was not required.

9.      The next day, May 13, 2025, Ms. White went back to the doctor and re-submitted an application for FMLA leave. She did not return to work that week, instead staying home on her doctor's advice, using accrued sick time. Later that week, on May 16, 2025, Ms. White received a letter in the mail, dated May 14, 2025. The letter was from Commissioner Holmes' assistant, and it informed Ms. White that her employment at the DOP was terminated, effective May 14, 2025. The letter contained no explanation.

10.     The circumstances surrounding Ms. White's termination indicate that she was fired because of her medical conditions and because she exercised rights afforded to her by the FMLA and the NYCHRL. Ms. White was never given any reason at all for her abrupt termination. She had no performance issues. She was not given any warnings or corrective action before her termination. And her termination came just one day after seeking FMLA leave.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Plaintiff's claim pursuant to 28 U.S.C. §1331.

12.     This Court has personal jurisdiction over Defendants because Defendants employed Plaintiff in this District, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

13.     Venue is properly before this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiff was employed in this District and a substantial part of the events or omissions giving rise to her claims occurred in this District.

## THE PARTIES

14.     Plaintiff resides in Freeport, New York.

15.     Defendant Juanita Holmes is the former Commissioner of the New York City Department of Probation, an agency of Defendant City of New York headquartered at 33 Beaver Street, New York, New York.

## STATEMENT OF FACTS

**Ms. White's Employment with the City.**

16.     Ms. White began working for the City in 1996. Until she joined the DOP, in 2024, Ms. White had not received any negative performance reviews, write-ups, or discipline in her nearly 30-year career working for the City.

17.     Ms. White's first job with the City was as a Child Welfare Specialist ("CWS") with the New York City Administration for Children's Services ("ACS"). At ACS, Ms. White was promoted to CWS Supervisor and then to Chief of Staff to the Deputy Commissioner of Family Permanency. Ms. White worked at ACS until 2015, when she joined the Kings County District Attorney's Office as Director of Educational Programs.

18.     Ms. White left the Kings County District Attorney's Office in 2016 to join the New York City Department of Education as the Senior Director of Partnerships and Programs.

She held that position until 2022, when she joined the New York City Department of Social Services ("DSS"), first as Deputy Chief of Staff, then as Chief of Staff to the Chief People Officer (the head of the department). Ms. White worked at the DSS until she transferred to the DOP.

19.     Ms. White began working at the DOP in August 2024. While at the DOP, Ms. White served as the Deputy Commissioner of Strategic Services. She was one of approximately nine Deputy Commissioners.

20.     Ms. White joined the DOP for multiple reasons. For one, Ms. White had never been a Deputy Commissioner before, and she wanted to be in a position to make a positive impact on the communities the DOP serves. The position was also a promotion that came with a higher salary.

21.     As Deputy Commissioner of Strategic Services, Ms. White had various responsibilities, including: overseeing the training unit, which trains the probation officers and ensures that the staff can safely perform their duties, including carry guns; overseeing the Neighborhood Opportunity Network ("NeON"), which is a network of organization and entities focused on connecting those on probation with opportunities, resources, and services; and overseeing the unit that evaluates the efficacy of DOP programming.

22.     As a Deputy Commissioner, Ms. White reported directly to Commissioner Holmes.

**Commissioner Holmes' Role at the DOP.**

23.     Holmes is a close ally of former mayor Eric Adams, with whom she worked at the New York Police Department.

24.     In March 2023, Mayor Adams appointed Holmes Commissioner of the DOP.

25.    Holmes had never worked for a probation department before and had limited experience in leadership positions.

26.    At the time of her appointment, Holmes was friends with Mayor Adams.

27.    As DOP Commissioner, Holmes made decisions concerning the hiring and firing of DOP employees, the level of compensation for DOP employees, and the work responsibilities and assignments given to DOP employees, including the Deputy Commissioners. Although Deputy Commissioners and other DOP employees could weigh-in on these matters, Holmes had ultimate authority and made these decisions unilaterally.

**Holmes' Mistreatment of Ms. White and Other Employees at the DOP.**

28.    As DOP Commissioner, Holmes implemented a number of changes that caused low morale and a staff exodus.

29.    For instance, Holmes required all probation officers to carry guns on their persons, even when making routine check-ins in the presence of children. Policies like this marked a general shift under Holmes, from the DOP focusing on rehabilitation to focusing on aggressive law enforcement.

30.    The problems occasioned by Holmes' leadership have been widely reported. *See e.g.*, https://www.yahoo.com/news/articles/embattled-probation-commisssioner-juanita-holmes-150200708.html (last visited January 29, 2026); https://pansapansa.org/2025/09/03/the-nypd-ification-of-new-yorks-probation-department/ (last visited January 29, 2026); https://www.thecity.nyc/2025/07/28/probation-department-juanita-holmes-city-council/ (last visited January 29, 2026).

31.    Upon joining the DOP, Ms. White noticed that Commissioner Holmes treated her staff hostilely.

32.    For example, Holmes harshly criticized the Deputy Commissioners for being "weak." Holmes considered the Deputy Commissioners weak because they did not berate and intimidate their subordinates.

33.    Holmes also regularly humiliated Ms. White by saying "you don't know what you're doing" and "what are we paying you for?" in front of other DOP employees. She would also test DOP employees' knowledge of small-bore details, asking "trivia" questions about DOP operations, and if the employee did not know the answer, Holmes would accuse the employee of "not know[ing] your job."

34.    Holmes also repeatedly stated that DOP employees had to report to work even when sick, unless they were hospitalized.

35.    During Ms. White's tenure at the DOP, when a problem arose in the DOP, Holmes would prioritize minimizing embarrassment to herself over addressing the problem.

36.    For example, in summer 2024, before Ms. White joined the DOP, certain probation officers undergoing training lost their bullets. Two probations officers discovered the breach in July 2024 and notified their superiors in the DOP several times. The NYPD investigated the missing bullets after a third probation officer filed a written complaint about the bullets in December 2024. The DOP took no action to address the missing bullets until the story leaked from the DOP as a result of that complaint. *See* https://www.nydailynews.com/2025/02/16/missing-bullets-5000-rounds-disappear-from-probation-department-records/ (last visited January 29, 2026).

37.    In December 2024, Holmes grew very upset that the missing bullets incident had been reported in the press and that she lost control over the narrative. She blamed Ms. White and other employees who were not working at the DOP at the time that the bullets went missing.

38.     Ms. Holmes retaliated against the DOP employees responsible for reporting the

missing bullets. Holmes suspended and transferred without explanation the two probation

officers who discovered the missing bullets. *See*

https://www.nydailynews.com/2025/02/16/missing-bullets-5000-rounds-disappear-from-

probation-department-records/ (last visited January 29, 2026). When those officers' union

president accused Holmes of taking these measures as retaliation for reporting the missing

bullets, Holmes retaliated against the union president by filing disciplinary charges against him.

*See* https://www.nydailynews.com/2025/06/24/probation-commissioner-juanita-holmes-files-

charges-against-officers-union-president/ (last visited January 29, 2026).

39.     In January 2025, several of Mayor Adams' close affiliates became embroiled in

ethics scandals. Some were charged with crimes, and many resigned.

40.     Around this time, Commissioner Holmes, herself a close affiliate of the former

mayor, became visibly more stressed.

41.     She also began to treat Ms. White worse than she had previously treated her.

Holmes began frequently berating Ms. White; calling her at inappropriate hours, such as during

the morning on a holiday weekend or at 9 p.m., to ask seemingly random, probing, non-urgent

questions; and baselessly criticizing Ms. White's work. Holmes would also belittle Ms. White

by, for example, disparagingly referring to her as an "event planner" even though Ms. White was

a Deputy Commissioner at an important City agency.

42.     In March 2025, someone from DOP's human resources department ("HR")

approached Ms. White and asked to speak privately. The HR representative told Ms. White that

he was speaking off the record because he feared retaliation from Holmes. He then disclosed that

Holmes was pressuring him to reduce Ms. White's salary, and that he ultimately would have to comply.

43.    Ms. White asked the HR representative to put in writing what he had just told her, to which he replied, "You know she doesn't do that. She does this all the time; she gets mad at someone and reduces their salary."

44.    Ms. White did not know what Ms. Holmes was "mad" about.

45.    Holmes' hostile, unfair, and erratic treatment caused Ms. White significant anxiety, stress, and other forms of emotional distress, such as sleep loss, weight fluctuations, headaches, shaking hands, and emotional dysregulation. Ms. White had never experienced any of these conditions in connection with the workplace.

46.    In February or March 2025, Holmes reduced Ms. White's salary by 23%, or $45,000.

47.    Ms. White never received advance notice of the salary reduction outside of the clandestine conversation with Mr. Brown, and she never received an explanation.

48.    Holmes' hostile treatment of Ms. White continued.

49.    Throughout Spring 2025, Ms. White consulted a doctor about the distress caused by Holmes and the DOP. Her doctor advised her to take time off from work to mitigate the anxiety and stress.

**Ms. White's Use of Sick Time and Request for FMLA Leave.**

50.    During the week of April 20, 2025, Ms. White spoke with an HR representative about certain times when Ms. White had recently called out sick. Ms. White told the representative that her treatment at work was causing her stress and anxiety.

9

51.     The HR representative acknowledged that Ms. White was exhibiting signs of stress and anxiety, and she told Ms. White that she was being targeted.

52.     He then handed Ms. White a form to apply for FMLA leave, and he suggested that she do so.

53.     On Thursday, May 1, 2025, Ms. White reported for work but began feeling sick, so she left work to see a doctor.

54.     Ms. White did not bring the FMLA form to the doctor because Ms. White hoped she would not need a prolonged absence from work. The doctor, Kecia Ford, M.D., gave Ms. White with a note excusing her absence through May 5, 2025, and Dr. Ford scheduled a follow-up appointment with Ms. White for that date. Ms. White submitted that note to DOP HR.

55.     On Monday, May 5, 2025, Ms. White attended the appointment at Dr. Ford's office and received another note that explained that Ms. White required additional absence from work for about one week. Ms. White submitted this note to DOP HR.

56.     On May 6, 2025, Dr. Beckford emailed Ms. White informing Ms. White that she had to apply for FMLA leave pursuant to DOP policy, because her expected absence would be for ten or more consecutive business days. Ms. White responded that she would provide that information to her doctor at an upcoming appointment that Friday, May 9, 2025.

57.     Around that time, Ms. White came to believe that she needed more extensive time away from work to address the stress and anxiety caused by her treatment there, and she independently decided that taking FMLA leave was appropriate.

58.     On May 9, 2025, Ms. White attended the appointment with Dr. Ford. She brought her FMLA form with her. Dr. Ford agreed that Ms. White required extensive leave to treat her

mental health conditions. Dr. Ford filled out the FMLA leave application that HR had provided to Ms. White.

59.    On the morning of Monday, May 12, 2025, Ms. White emailed the FMLA application to DOP HR, including the Assistant Commissioner of Human Resources and Labor Relations, Dr. Chikera Beckford.

60.    Later that day, Dr. Beckford called Ms. White and told her that she needed to apply for FMLA leave in order to continue to stay home sick. It was clear from the conversation that Dr. Beckford was unaware that Ms. White had applied for FMLA leave that morning.

61.    During this call, Ms. White informed Dr. Beckford that she had submitted an FMLA leave application that morning by email.

62.    Dr. Beckford then reviewed the application and told Ms. White that she had to re-apply for FMLA leave, saying that Ms. White had submitted the wrong form.

63.    Ms. White responded that she would go to her doctor in order to re-submit the application.

64.    Later that day, Dr. Beckford emailed Ms. White, attaching a form that she stated was the appropriate form for applying for FMLA leave. The attached form was identical to the one that Ms. White had already submitted, except that the earlier application had an additional, immaterial two-page cover sheet.

65.    Ms. White received a follow-up call from Dr. Beckford the same day. Echoing Holmes' language, Dr. Beckford told Ms. White that Ms. White would have to return to work during the pendency of her leave application, "unless [she was] in the hospital."

66.    Ms. White asked Dr. Beckford to put in writing the requirement to report to work while an FMLA application pends, absent hospitalization. Dr. Beckford grew defensive and

11

stated that the requirement was simply what "Bridget," the DOP's general counsel, told her. Ms. White asked again for that to be put into writing. Dr. Beckford abruptly ended the call.

67.     On May 13, 2025, Ms. White went back to Dr. Ford's office. She told Dr. Ford that her hostile treatment at work, which she had previously described to Dr. Ford, was escalating. Ms. White also stated that the DOP was requiring her to re-submit the FMLA leave application.

68.     At the appointment, Dr. Ford and Ms. White grew confused because the initial application form and the subsequent one provided by Dr. Beckford appeared identical. In Dr. Ford's presence, Ms. White called a representative of DOP HR to ask what the differences in the forms were and what was deficient about the initial application.

69.     The HR representative was unable to explain the difference in the two FMLA forms or why the initial application was insufficient.

70.     Nevertheless, Dr. Ford completed the application again.

71.     When discussing in the application the causes of her conditions, Ms. White asked Dr. Ford to refrain from mentioning her toxic work environment.

72.     On May 13, 2025, Ms. White faxed her second FMLA leave application to DOP HR.

73.     In that application, Dr. Ford stated that Ms. White requires FMLA leave due to "sleep disturbances, fatigue, anxiety, headaches and unexplained physical problems." Dr. Ford also stated in the form that, as a result of these conditions, Ms. White would be incapacitated for an estimated three months, and that it was medically necessary for Ms. White to be absent from work.

74.    Ms. White was eligible for FMLA leave. She had worked for the City for well over 12 months before requesting leave. Ms. White also worked far more than 1,250 hours during that 12-month period: her job required attendance from 9am to 5pm, Monday through Friday.

**Ms. Holmes' Termination.**

75.    On Friday, May 16, 2025, Ms. White received a letter in the mail from Dr. Beckford. The letter was dated May 14, 2025, one day after Ms. White submitted the application for FMLA leave.

76.    The letter informed Ms. White that her employment with the DOP was terminated effective as of May 14, 2025, two days before Ms. White received the letter.

77.    Ms. White received no explanation for her termination.

## COUNT ONE
### (Retaliation in Violation of the FMLA – 29 U.S.C. § 2601, *et seq.*)

78.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

79.    At all times relevant to the allegations herein, Defendants were employers as defined by the FMLA (29 U.S.C. § 2611(4)).

80.    At all times relevant to the allegations herein, Plaintiff was an eligible employee as defined by the FMLA (29 U.S.C. § 2611(2)).

81.    In requesting FMLA leave, Ms. White exercised a right protected under the FMLA (29 U.S.C. § 2612).

82.    Ms. White was qualified for her position.

83.     Defendant retaliated against Plaintiff in the terms and conditions of her employment by terminating her because she requested FMLA leave, in violation of the FMLA. Ms. White was never given a reason for her termination.

84.     As a result of Defendants' retaliation, Plaintiff has suffered damages.

## COUNT TWO
### (Interference in Violation of the FMLA – 29 U.S.C. § 2601, *et seq.*)

85.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

86.     At all times relevant to the allegations herein, Defendants were employers as defined by the FMLA (29 U.S.C. § 2611(4)).

87.     At all times relevant to the allegations herein, Plaintiff was an eligible employee as defined by the FMLA (29 U.S.C. § 2611(2)).

88.     In May 2025, Ms. White was entitled to take leave pursuant to the FMLA because she had worked for the city for at least 12 months and had worked over 1,250 hours during the 12 months preceding her FMLA leave application.

89.     Defendants denied Ms. White a benefit to which she was entitled under the FMLA after Ms. White gave Defendants notice of her intention to take FMLA leave, in violation of the FMLA (29 U.S.C. § 2615(a)(1)).

## COUNT THREE
### (Retaliation in Violation of the NYCHRL - New York City Admin. Code § 8-107)

90.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

91.     The FMLA leave that Plaintiff sought constituted a reasonable accommodation for a disability under the NYCHRL.

92.     Plaintiff's request for FMLA leave constituted a protected activity under the

NYCHRL.

93.     Defendants retaliated against Plaintiff in the terms and conditions of her

employment by terminating her because she requested FMLA leave, in violation of the

NYCHRL. Ms. White was never given a reason for her termination.

94.     As a result of Defendants' retaliation, Plaintiff has suffered damages.

## COUNT FOUR
### (Discrimination in Violation of Section 504 of the Rehabilitation Act - 29 U.S.C.S. § 794) (Against Defendant the City of New York)

95.     Plaintiff repeats and realleges each and every allegation contained in the

paragraphs above with the same force and effect as if fully set forth herein.

96.     At all times relevant to this action, Defendant the City of New York is a recipient

of federal financial assistance. *See* https://www.osc.ny.gov/reports/budget/fed-funding-

ny/federal-funds-new-york-city (last visited January 29, 2026).

97.     The conditions for which Plaintiff sought FMLA leave constitute a disability

under the Rehabilitation Act.

98.     Plaintiff was otherwise qualified for her position at the DOP.

99.     Defendants violated Section 504 of the Rehabilitation Act of 1973, 29 USC §794,

by terminating Plaintiff's employment on the basis of her disability.

100.    As a result of Defendants' retaliation, Plaintiff has suffered damages.

## COUNT FIVE
### (Discrimination in Violation of the NYSHRL - New York Executive Law § 290, *et seq.*)

101.    The conditions for which Plaintiff sought FMLA leave constitute a disability

under the NYSHRL.

102.    Plaintiff was otherwise qualified for her position at the DOP.

103.    Defendants discriminated against Plaintiff in the terms and conditions of her employment by terminating her because she suffered from a disability, in violation of the NYSHRL.

104.    As a result of Defendants' retaliation, Plaintiff has suffered damages.

**COUNT SIX**
**(Discrimination in Violation of the NYCHRL – New York City Admin. Code § 8-107)**

105.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

106.    The conditions for which Plaintiff sought FMLA leave constitute a disability under the NYCHRL.

107.    Plaintiff was otherwise qualified for her position at the DOP.

108.    Defendants discriminated against Plaintiff in the terms and conditions of her employment by terminating her because she suffered from a disability, in violation of the NYCHRL.

109.    As a result of Defendants' retaliation, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.  Awarding Plaintiff economic and compensatory damages, including for emotional pain and suffering;

B.  Awarding Plaintiff punitive damages;

C.  Awarding Plaintiff injunctive relief;

D.  Awarding reasonable attorneys' fees, costs, and expenses;

E.  Ordering Plaintiff's reinstatement to her former position at the Department of Probation; and

F.  Granting Plaintiff such other relief as the Court deems appropriate and equitable.

16

Dated: January 30, 2026
         New York, New York

                              GISKAN SOLOTAROFF & ANDERSON LLP


                                      /s/
                              By:     David O'Brien
                                      dobrien@gslawny.com
                                      (212) 847-8315
                                      1 Rockefeller Plaza, 8th Floor
                                      New York, New York 10020

                                      Attorneys for Plaintiff